**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ENVESTNET ASSET MANAGEMENT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 09-CV-7572 |
| | ) | |
| v. | ) | Judge Robert W. Gettleman |
| | ) | |
| FETTER LOGIC, INC., and DAVID FETTER, | ) | Magistrate Judge Michael T. Mason |
| | ) | |
| Defendants. | ) | |
| | ) | |

**ENVESTNET'S FIRST AMENDED COMPLAINT**

Plaintiff Envestnet Asset Management, Inc. ("Envestnet") brings this action against

Defendants Fetter Logic, Inc. ("Fetter") and David Fetter (collectively the "Defendants"), and

alleges as follows:

**INTRODUCTION**

1.     This case arises from the false, misleading and fraudulent conduct of Fetter, and

its President, CEO and namesake, David Fetter.  Defendants fraudulently induced Envestnet into

investing $5.7 million based on false and misleading statements about Fetter's true financial

condition and the completeness of its software applications.  Shortly before Envestnet agreed to

make a substantial investment in Fetter, Fetter suffered substantial declines in revenue, took on

undisclosed debt, and stopped paying its creditors.  Notwithstanding these significant adverse

events, Fetter and David Fetter represented to Envestnet that Fetter had not suffered any material

changes to its business.  In reliance on these misrepresentations, Envestnet acquired $5.7 million

in Fetter shares.  David Fetter personally received proceeds of $532,940.

2.     Fetter is now insolvent and Envestnet faces the total loss of its investment.  In

addition, Fetter is claiming rights in certain intellectual property, specifically the Envestnet

Advisor Q Functionality (defined below), thus clouding Envestnet's title to that property and preventing Envestnet from marketing that property to customers.

3.     In this action, Envestnet seeks (1) a declaratory judgment that Envestnet owns all intellectual property rights and other rights to the Envestnet Advisor Q Functionality; (2) an injunction barring Defendants from interfering with Envestnet's unrestricted right to market and sell the Envestnet Advisor Q Functionality; (3) damages incurred by Envestnet as a direct and proximate result of Defendants' fraud and breaches of contract; and (4) an order granting Envestnet punitive damages, costs and such other relief as the Court deems proper.

## THE PARTIES

4.     Envestnet is a Delaware corporation with its principal place of business in Chicago, Illinois.  Envestnet is an industry leader in the provision of wealth management solutions to independent financial advisers, offering an integrated web-based unified managed account platform ("UMP").  Through this platform, financial advisors have access to a complementary package of investment products, proposal generation tools, account management and portfolio management tools.  The platform also provides back office services, such as data aggregation, administration for trading and custodial functions, fee billing and compliance management.

5.     Defendant Fetter is a Colorado corporation with its principal place of business in Denver, Colorado.  Fetter is engaged in the business of licensing proprietary software and providing services to customers in the securities brokerage industry.  Fetter is a party to the Investment Agreement with Envestnet.  (Ex. 1)  Fetter is also a party to the Operating Agreement with Envestnet.  (Ex. 2)  On information and belief, Fetter is currently insolvent and unable to pay its debts as they become due in the ordinary course of business.

6.      David Fetter is the President and CEO of Fetter Logic.  David Fetter is a citizen of Colorado.  He is a party to the Investment Agreement with Envestnet both individually and as a signatory for Fetter.  David Fetter delivered to Envestnet, as required under the Investment Agreement, a certificate (falsely) certifying that the conditions specified in the Investment Agreement had been fulfilled and that the representations and warranties of Fetter, David Fetter and the other participating shareholders were true in all material respects as of the closing date. David Fetter also signed the Operating Agreement with Envestnet.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because (a) the Plaintiff and Defendants are of diverse citizenship in that Envestnet is a citizen of Delaware and Illinois and Defendants are citizens of Colorado and (b) the amount in controversy is in excess of $75,000, exclusive of costs and interest.  This Court also has subject matter jurisdiction over this action for declaratory judgment pursuant to 28 U.S.C. § 2201.

8.      Venue is proper in this district because a substantial portion of the claims alleged herein took place in this district and a substantial part of the property that is the subject of this action is located here.

## FACTUAL BACKGROUND

9.      Envestnet offers a web-based platform to financial institutions and independent advisors.   That platform includes a front-office wealth management platform, with account management resources, proposal generation, research content and evaluation tools, investment solutions, reporting capabilities, and a branded web-based interface with end-client access.  The platform also provides back office services, such as data aggregation, administration for trading

and custodial functions, fee billing and compliance management.  Envestnet is an industry leader in providing such integrated resources to independent advisors.

10.      Fetter provides certain software services to broker dealers.

11.      Envestnet and Fetter saw an opportunity to integrate their respective applications and services, leveraging the software development services and sales support capabilities of Envestnet to develop, enhance, integrate, market and sell the parties' respective offerings.

12.      In the summer of 2008, Envestnet and Fetter began discussing a possible collaboration between Envestnet and Fetter, including the integration of certain aspects of their respective technology and service offerings.  After some discussions, the parties agreed to structure their transaction through several interrelated agreements, each effective on December 19, 2008.  The two principal transactions were embodied in the Investment Agreement, in which Envestnet agreed to acquire Fetter shares, and the Operating Agreement, which governed the parties' development, integration, marketing and sales efforts.

**A.      The Investment Agreement.**

13.      As part of the overall transaction, Envestnet agreed to make a substantial investment in Fetter.  The terms of the investment were detailed in an Investment Agreement and certain schedules and ancillary agreements entered into between the parties on December 19, 2008 (the "Investment Agreement").  The Investment Agreement and schedules are attached as Exhibit 1.

14.      Pursuant to the Investment Agreement, Envestnet agreed to pay $4,900,000 to purchase 400,000 shares of Fetter stock issued from the company.  Envestnet also agreed to purchase an additional 80,000 shares from certain individual shareholders for an additional $800,000.  The principal selling shareholder was David Fetter, who sold 53,294 of the 80,000

shares, netting proceeds of $532,940.  As a result of its investment, Envestnet ended up acquiring 19.9% of Fetter's outstanding shares.

15.     The individual shareholders also issued Envestnet certain warrants and call option shares that would permit Envestnet to purchase the remaining shares of Fetter at a price based on a predetermined formula, beginning on June 19, 2011.

16.     To induce Envestnet's investment in Fetter, Fetter and David Fetter made numerous false and misleading statements of fact regarding Fetter's financial condition.

17.      These false representations and warranties were included in the Investment Agreement itself; in the compliance certificate delivered by David Fetter at closing; in the due diligence information provided to Envestnet by David Fetter and other corporate officials; and in statements by David Fetter and other corporate officials made to Envestnet CEO, Judson Bergman, and various other Envestnet corporate officials, including Peter D'Arrigo (Chief Financial Officer) and Mike Apker (Managing Director).

18.      The Investment Agreement included the following false and misleading representations:

- "Except as set forth on Schedule 2(h), no employee, officer, Shareholder or director of the Company or member of his or her immediate family is indebted to the Company, nor is the Company indebted . . . to any of them." Investment Agreement, § 2(h).

- "Except as set forth on Schedule 2(k), the Company is not in violation or default . . . in any material respect of any provision of any mortgage, indenture, agreement, instrument, or contract to which it is a party . . . ." Investment Agreement, § 2(k).

- "The Company has delivered to Envestnet its unaudited financial statements (balance sheet and profit and loss statement, statement of Shareholders equity and statement of cash flows including notes thereto) for the fiscal year ended December 31, 2007 and its unaudited financial statements . . . for the six-month period ended June 30, 2008. . . .  The financial statements fairly present the financial condition and operating results of the Company as of the dates, and for the periods, indicated therein . . . .  Except as set forth in the Financial

Statements, the Company has no material liabilities, contingent or otherwise, other than (i) liabilities incurred in the ordinary course of business subsequent to December 31, 2007 and (ii) obligations under contracts and commitments incurred in the ordinary course of business and not required under US GAAP to be reflected in the financial statements . . ." Investment Agreement, § 2(o).

- "Since June 30, 2008, there has not been: (i) any change or development that would reasonably be expected to materially and adversely effect the assets, properties, business, prospects, results of operations or financial condition of the Company; . . . (v) any material change to any material contract or arrangement by which the Company or any of its assets is bound or subject; . . . (ix) receipt of notice that there has been a loss of, or material cancellation by, any major customer of the Company." Investment Agreement, § 2(p).

19.     The Investment Agreement also provided that Fetter "will use the proceeds from the sale of the Company Shares for working capital; provided that the Company may use in its discretion a portion of such proceeds, not to exceed $750,000, to repay some or all of the debt listed in Schedule 5(g)."

20.     The representations and warranties contained in the agreement were to last for a period of one year, expiring on December 19, 2009. *See* Investment Agreement, § 8(b).

21.     On December 19, 2008, at the closing, David Fetter certified in writing that: "The representations and warranties of the Company contained in Section 2 and the representations and warranties of the Shareholders contained in Section 3 are true and correct in all material respects on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the date of the Closing Date."

22.     Based on the June 30, 2008 financial statements and other information and documentation received from Fetter in the course of due diligence, (i) the working capital of Fetter (*i.e.*, the current assets minus current liabilities) following the Envestnet investment was expected to be $4.6 million; (ii) the revenue of Fetter was expected to be at least $1.8 million per quarter (with annualized revenue of $7.2-9.0 million); and (iii) the quarterly operating loss of Fetter was expected to be no worse than $0.7 million.

23.     In email communications in November 2008 and at a meeting in Fetter's office on November 20, 2008, Fetter CFO Ryan Tomazin and Controller Ginger Laser provided due diligence information to Envestnet CFO Peter D'Arrigo and Controller Dale Seier showing, among other things, that (i) the working capital of Fetter following the Envestnet investment would be $4.6 million; (ii) the quarterly operating loss of Fetter was expected to be no worse than $0.7 million; and (iii) the ordinary course monthly accounts payable and accrued liabilities as of the end of September 2008 were $0.6 million.  Prior to or at the meeting, they provided Messrs D'Arrigo and Seier with the financial statement for September 2008 and a pro forma financial statements reflecting what the financial condition of Fetter would be if the transaction closed on November 26, 2008.  In both cases, the reported results were entirely consistent with the Envestnet assumptions described above in Paragraph 22.

24.     Just days before the closing, Fetter CFO Ryan Tomazin represented to Envestnet that "[w]orking capital is still in line" with prior projections and was expected to be within $100,000 of the $4.6 million expected by Envestnet.

25.     Similarly, in a telephone call shortly before the closing, David Fetter represented to Envestnet CEO Bergman that (i) Fetter's revenue had not been hurt by the economic downturn; (ii) the current annual revenue run rate was approximately $7.5 million; (iii) the annual revenue for 2009 was expected to be approximately $9.0 million; and (iv) the operating losses were expected to be approximately $100,000 per month.

26.     In reliance on these and other representations, Envestnet executed the Investment Agreement and Operating Agreement on December 19, 2008.

**B.     Envestnet Discovers Fetter's True Financial Condition.**

27.     Just a few months later, on March 30, 2009, Fetter delivered to Envestnet Fetter's financial statements for the year ending December 31, 2008.  In reviewing the December 31,

- 7 -

2008 financial statements, Envestnet discovered that the representations Fetter and David Fetter made to induce Envestnet to invest in Fetter were false.  These statements revealed, among other things:

- Fetter's reported working capital was lower than expected by approximately 30%, $3.2 million rather than $4.6 million;

- Fetter's quarterly revenue had dropped approximately 40%, from $1.8 million to $1.1 million, and was trending lower; and

- Fetter's operating loss had increased almost 200%, from $0.7 million per quarter to $2.0 million per quarter.

28.    The year-end financials obtained by Envestnet on or about March 30, 2009 and other information obtained by Envestnet about that time showed that, during the 12 days immediately following the closing, Fetter used approximately $1.4 million of the investment proceeds to pay past due debts, accounts payable and other accrued liabilities that Fetter had permitted to accumulate during the period preceding the closing, none of which had been disclosed to Envestnet.  Fetter misrepresented in the Investment Agreement and the certification of David Fetter that it was not in default in any material respect under the payment or other terms of any indenture, agreement, instrument, or contract to which it was a party.  These extraordinary expenditures were in addition to the permitted use of up to $750,000 to repay some or all of certain disclosed debts (Investment Agreement, § 5(g)).  Had Envestnet known of the past due debts, accounts receivable and accrued liabilities and Fetter's intention to use the investment proceeds for this purpose, it would have raised serious red flags about Fetter's financial condition and would have alerted Envestnet that Fetter's financial condition was far worse than Envestnet had been led to believe.

29.    Envestnet learned in April 2009 that Fetter had borrowed $250,000 from a Fetter director during the week preceding closing in order to meet its payroll obligations for the month.

Fetter did not disclose this to Envestnet and, to the contrary, represented in the Investment

Agreement and in the certification of David Fetter that there were no related-party loans

outstanding.  Had Envestnet known of this loan, and that Fetter was not able to make payroll,

that would have raised serious concerns about Fetter's financial condition and would have

alerted Envestnet that Fetter's financial condition was far worse than Envestnet had been led to

believe.

       **C.**     **The Operating Agreement.**

      30.     In addition to the Investment Agreement, Envestnet and Fetter also entered into

the Operating Agreement, pursuant to which the parties intended to integrate their respective

offerings and to develop and eventually sell a joint product offering to their respective clients.

      31.     The Operating Agreement provided that representatives from each company

would form a Steering Committee, which was to be responsible for formulating and

implementing a plan for development and integration of the companies' joint offering, defining

the specific development work to be undertaken by Envestnet's development staff and, to the

extent necessary, agreeing on the ownership of developed materials that were not derivative

works of a party's existing software or materials.  That plan was to take into consideration

factors such as the shared goal of integrating the two parties' applications, and the importance of

allowing each party to function independently in the event that Envestnet did not exercise its

warrants and options.  The Steering Committee was initially comprised of Envestnet Executive

Vice President of Engineering, Babu Sivadasan, and Fetter Chief Operating Officer, Jeffrey

Knight.

      32.     When deciding to enter into the Operating Agreement and related Investment

Agreement, Envestnet relied on Fetter's representations during the due diligence process that

Fetter had existing, integrated software applications built on top of its Helio database, which

could be used by customers generally and that additional functionality could be integrated with

Fetter's applications in a commercially-reasonable amount of time and at a commercially-

reasonable cost.  Fetter repeatedly represented its software was "80-90% there," meaning that the

software functionality existed but needed some additional work to make it more robust.  Fetter

made these representations, and similar representations, in numerous communications with

Envestnet including the following:

- A meeting at Fetter's offices in Denver in July 2008 attended by Michael Apker and Peter D'Arrigo for Envestnet and David Fetter, Jeff Knight and Michael Urness for Fetter.

- A meeting in mid-September 2008 at Fetter's offices in Denver attended by James Lumberg, Babu Sivadasan, Michael Apker and Mark Osmond for Envestnet and David Fetter, Lindsay Faussone, and Wiley Asher for Fetter.

33.      The Operating Agreement was premised on Envestnet's understanding that, and

contemplated that, (i) the Fetter software products were capable of delivering and being

enhanced to deliver desirable features and functionality to broker-dealers and individual

investment advisors; (ii) the Fetter software products were sufficiently robust and scalable to

deliver such features and functionality to multiple customers; (iii) the Fetter software products

had been and could be integrated with one another to provide an integrated suite of software

products; (iv) the Fetter software products were, in David Fetter's words, "80-90% there;" (v) the

Fetter software products had been and could be linked to all major custodial data sources

including Pershing LLC; (vi) the Fetter software products could be built on one common Fetter

Helio database and integrated to run against Envestnet's proprietary Unified Management

Platform ("UMP"), and (vii) Fetter would pay for development work involving Fetter software

products, in part, using the proceeds of Envestnet's investment.

34.     The Operating Agreement contained protections for intellectual property that each party brought into the arrangement and expressly provided that any "extension or modification of a Party's Software shall be deemed a Derivative Work owned by such Party even if such modification is made to accommodate or connect with the other Party's Software." *See* Operating Agreement § 9.

35.     Through Envestnet's proprietary UMP, Envestnet provides independent financial advisors with the ability to build customized portfolio models and choose from over 1,200 investment products.  Envestnet's UMP is the platform on which most of Envestnet's other financial software applications are built, allowing the end-user to access an array of applications through one primary interface.

36.     The Operating Agreement contemplated that Envestnet would provide performance reporting technology, which would be integrated with Fetter's broker/dealer software products to provide advanced functionality to Envestnet's and Fetter's clients.  The first (and only) product that was approved for development by the Steering Committee was a software application called Advisor Q.  Advisor Q was intended to permit broker/dealers and individual advisors to view account and performance information on both an individual account level (individual customer level) and on an aggregate portfolio level (an entire book of business).  While such a product was not unique in the marketplace (indeed, Envestnet and others already had similar offerings), Envestnet expected the combination of Envestnet's performance reporting technology and the software product Fetter professed to have to be viewed favorably in the marketplace, especially as part of an integrated suite of broker-dealer software products).

37.     Unfortunately, Envestnet soon discovered that Fetter's software was woefully inadequate for the purposes contemplated by the Operating Agreement.  Contrary to what

Envestnet had been led to believe, the Fetter software products were highly customized, client-specific solutions that (i) could not be readily enhanced to add desired features and functionality; (ii) were not sufficiently robust and scalable to service multiple clients; (iii) could not be built on one Helio database or readily be integrated with one another to provide an integrated suite of software products; (iv) were not, in David Fetter's words, "80-90% there;" and (v) had not been and could not be linked quickly enough to many of the largest and most commonly used custodial data sources, including Pershing LLC, the second largest provider of such data.

38.     Shortly after the parties began working together, it became apparent that Fetter had misrepresented the nature and extent of the development completed on the Fetter platform, that much of the claimed functionality did not exist and that what did exist would not be an appropriate base on which to develop the desired product offering.  In the case of Advisor Q, it also became apparent that the Fetter product would have to be rebuilt from scratch, that 80% of the desired functionality already existed on the Envestnet technology platform, that Fetter's product relied heavily on screenshots and other information obtained by Fetter from Envestnet, and that the quickest and least expensive way to develop the product would be to leverage Envestnet's existing functionality and develop the desired product on the Envestnet UMP platform.

39.     Additionally, given the sharp drop in Fetter's revenue run rate, the misuse of investment proceeds and the amount of cash then on hand, it was clear that Fetter could not fund the sales or development efforts contemplated in the Operating Agreement.

40.     As a result of these and other deficiencies in Fetter's existing software applications, the feedback received from prospective clients who expressed a clear preference for Envestnet's more mature applications, the pressing need to develop a working product to meet

the demands of prospective clients and Fetter's inability to fund the required development effort, the Steering Committee, with the knowledge and acquiesncence of David Fetter, concluded in March 2009 that the Advisor Q Functionality would have to be built directly onto Envestnet's UMP platform.  Envestnet thereafter developed the functionality, referred to as the Tier 1, 2, and 3 Advisor Q functionality (hereafter the "Envestnet Advisor Q Functionality" or "the Functionality") on the Envestnet UMP platform.  This consisted largely of repackaging existing Envestnet functionality and developing some additional functionality to the extent necessary.

       **D.**       **Fetter Agrees That Envestnet Owns the Envestnet Advisor Q Functionality.**

       41.       Upon learning of the misrepresentations made by Fetter and David Fetter regarding Fetter's financial condition, and of the deficiencies in Fetter's software, Envestnet CEO, Judson Bergman, Executive Vice President, Jim Lumberg and Managing Director, Mike Apker, requested a meeting with Fetter to discuss the future of the parties' business relationship. On April 2, 2009, Messrs. Bergman, Apker, and Lumberg met with David Fetter and Mike Urness, a Fetter board member, and detailed Envestnet's concerns with and requirements of Fetter in order to continue with the relationship.  On the topic of "what Envestnet needs from [Fetter] to go forward," Envestnet identified, among other things:

- "Clear ownership of technology development, product development and management (especially now that we are building on top of Envestnet software)"

- "Amend operating agreement to reflect that much of the product is being built on top of an Envestnet software chassis"

       42.       At the April 2, 2009 meeting, David Fetter agreed with all major requirements demanded by Envestnet, including that Envestnet would own the Envestnet Advisor Q Functionality.  Thereafter Envestnet developed the functionality on that basis.

43.     On April 15, 2009, Envestnet's CEO Bergman, President Bill Crager and Executive Vice President Jim Lumberg met David Fetter in New York City.  David Fetter again agreed to all Envestnet demands in order to have the relationship continue, including, among other things, that the Envestnet Advisor Q Functionality would be developed on the Envestnet platform and be owned by Envestnet.

44.     Mr. Lumberg promptly sent Mr. Fetter an email memorializing the terms to which the parties orally agreed at the meeting, including that Envestnet owned the Envestnet Advisor Q Functionality and had the right to sell "Advisor Q Tiers I, II, III without [Fetter] involvement."

45.     The following day, David Fetter sent an email stating that he "was on board with the terms we discussed yesterday."  He ended: "we all agree on this- so we will get this done!"

46.     The Fetter board of directors subsequently directed two of the Steering Committee members, Jeff Knight and Jim Lumberg, to create an amendment to the Operating Agreement to be executed by the parties.  On April 30, 2008, Messrs. Knight and Lumberg circulated a detailed outline of the now agreed terms, including Envestnet's ownership of the Envestnet Advisor Q Functionality.

47.     Despite the parties' agreement, Fetter delayed signing a written agreement memorializing the terms of the agreement.  All parties, however, performed pursuant to the terms agreed to and Envestnet continued, at its own expense, to develop the Envestnet Advisor Q Functionality per that agreement.

48.     Partly because of Fetter's continued failure to deliver a final signed agreement, Envestnet demanded another meeting.  Envestnet CEO Bergman, Chief Financial Officer Peter D'Arrigo, Managing Director Mike Apker, General Counsel Shelly O'Brien, and outside counsel, Daniel Masur met with David Fetter, two Fetter directors, David Colvin and Michael

Urness, and Fetter's outside counsel, Keith Berets, in Chicago, Illinois, on May 12 and 13, 2009.

(Peter D'Arrigo and David Colvin only attended the meeting on May 12.)  At these meetings,

Envestnet again stated its concerns about Fetter's misrepresentations regarding its financial

condition and its resulting inability to adequately fund development of additional software.

Envestnet noted its concern with David Fetter's conduct of Fetter's business and expressed a

desire that a management committee be established to help manage Fetter.  To secure agreement,

Envestnet offered concessions benefiting Fetter, which are described below.

49.     During that meeting, the parties agreed, in specific detail, to all terms of an

amendment to the Operating Agreement.  Those terms were reflected in a draft Second

Amendment to the Operating Agreement, prepared within days of the parties' meeting.  Each

item in the Second Amendment was read out loud to David Fetter, who expressly consented to it

in the presence of his counsel and Fetter director Michael Urness.

50.     Among other terms in that Second Amendment, the parties memorialized that the

Envestnet Advisor Q Functionality would be built on the Envestnet platform at Envestnet's

expense, and that Envestnet would own all rights, title and interest to it.  The parties agreed that

Fetter would be the exclusive reseller for Advisor Q under the "Advisor Q" name, but that

Envestnet could market, sell and use the Envestnet Advisor Q Functionality under different

names for different purposes both during the term of the Agreement and upon its termination.

The parties also agreed that a Management Committee consisting of an Envestnet employee and

Fetter employee would assume certain day-to-day responsibility for certain management

functions, and that certain other governance changes would be implemented.

51.     The Second Amendment included changes that benefited Fetter: (1) the amount to

be paid by Fetter for Sales Services was reduced, (2) the invoicing to and payment by Fetter of

charges for Sales Services for 2009 were delayed, (3) Envestnet would reduce the rates for development services by 10%, and (4) the hiring of Fetter employee, Lisa Erickson, at Fetter's request.

52.     Following the May 12 and 13, 2009 meeting, and in reliance on Fetter's express agreement to the terms of the Second Amendment, Envestnet performed its obligations thereunder, including those stated as items 1-3 in the preceding paragraph, in accordance with the terms agreed at the May meetings.  Envestnet continued to develop the Envestnet Advisor Q Functionality on Envestnet's platform at Envestnet's expense.

53.     Fetter continued to delay signing the Second Amendment.  Fetter's most common delaying technique was for David Fetter, when finally forced to respond, to ask for some new additional change and then again fail to respond (or be located) for days or weeks after getting a revised draft.

54.     Although the parties continued to exchange comments concerning other aspects of the Second Amendment – most particularly related to corporate governance– the parties' development and sales efforts were performed consistent with the terms of the Second Amendment related to the Envestnet Advisor Q Functionality.

55.     Envestnet has invested substantial amounts of time and money in the development of the Envestnet Advisor Q Functionality.  Envestnet intends to further develop the Envestnet Advisor Q Functionality and to sell that product as part of Envestnet's integrated platform.

56.     Fetter and David Fetter dispute Envestnet's understood right to own and sell the Envestnet Advisor Q Functionality.

57.     Defendants' actions are causing irreparable harm to Envestnet, interfering with Envestnet's ability to provide certain services to its customers and interfering with Envestnet's

customer relationships.  Envestnet has no adequate remedy at law, especially since Fetter is insolvent.  Consequently, Envestnet institutes this action to obtain a declaratory judgment that Envestnet owns and controls all necessary intellectual property rights to use, market and sell the Envestnet Advisor Q Functionality without restriction and injunctive relief to prevent Defendants from interfering with Envestnet's exercise of such rights.  Envestnet also seeks compensatory damages, punitive damages and other relief to remedy Fetter's and David Fetter's breaches of contract and fraud.

## COUNT I - DECLARATORY JUDGMENT AND INJUNCTION

58.     Envestnet alleges and incorporates by reference all allegations in this Complaint, as though fully set forth herein.

59.     Pursuant to 28 U.S.C. § 2201, Envestnet seeks a declaratory judgment that Envestnet owns all right, title and interest in all aspects of the Envestnet Advisor Q Functionality, and that Envestnet retains the unrestricted right to market, sell and use the Envestnet Advisor Q Functionality.

60.     At all times prior to Envestnet's entering into the Investment and Operating Agreements with Fetter, Envestnet was the sole and exclusive owner of the UMP platform on which the Envestnet Advisor Q Functionality was built, and several software modules, which, when integrated, comprise the basis for the Envestnet Advisor Q Functionality.

61.     Defendants have never owned any interest in the UMP platform, nor any of the Envestnet software modules on which the Envestnet Advisor Q Functionality is based.

62.     Under the terms of the Operating Agreement, each party was to continue to own the intellectual property that it brought into the relationship, as well as any intellectual property that was thereafter developed directly on a party's software architecture or constituted an extension or modification of the party's pre-existing software applications.  Pursuant to the

Operating Agreement, the Steering Committee decided that Envestnet would build the Envestnet Advisor Q Functionality at its own expense and on its own platform and that Envestnet would own the Envestnet Advisor Q Functionality.  The Envestnet Advisor Q Functionality was built directly on Envestnet's UMP platform, at Envestnet expense, using the functionality of various software applications already owned by Envestnet and existing on its UMP platform.

63.    None of the functionality of the Envestnet Advisor Q Functionality is based on or incorporates any intellectual property owned by Fetter, built by Fetter, or paid for by Fetter.  The Envestnet Advisor Q Functionality is, therefore, an "extension or modification" of Envestnet's existing software and, thus, a Derivative Work as defined by the Operating Agreement, exclusively owned by Envestnet.

64.    Based on Fetter's continued failure to sign the Second Amendment to the Operating Agreement and recent statements and actions of Fetter, David Fetter and other Fetter representatives, Envestnet believes that Fetter is trying to cloud title of Envestnet to ownership of the Envestnet Advisor Q Functionality and its right to market and sell that Functionality without any restrictions, notwithstanding Fetter's previous agreements and representations concerning Envestnet's ownership of that Functionality.

65.    Envestnet has devoted substantial time and money in developing the Envestnet Advisor Q Functionality and expects to incur additional substantial costs maintaining, enhancing and integrating that Functionality with Envestnet's other products.  Envestnet seeks a declaratory judgment in order to confirm its ownership of, and unrestricted rights to sell, the Envestnet Advisor Q Functionality before it makes any further substantial investments in that Functionality.

66.     A declaration by this Court regarding the ownership of the Envestnet Advisor Q

Functionality and the right to proceeds from the sale or licensing of the Functionality will settle

this dispute.

67.     WHEREFORE, Envestnet prays for a declaration under 28 U.S.C. § 2201 that (1)

Envestnet is the sole and exclusive owner of the Envestnet Advisor Q Functionality, (2) that

Defendants do not possess any ownership interest in the Envestnet Advisor Q Functionality and

(3) that Defendants are not entitled to any proceeds from the sale or licensing of the Envestnet

Advisor Q Functionality.

## COUNT II - DECLARATORY JUDGMENT AND INJUNCTION

68.     Envestnet alleges and incorporates by reference the allegations paragraphs of this

Complaint, as though fully set forth herein.

69.     For the reasons set forth in Count I, Envestnet believes that it was always the sole

and exclusive owner of all rights in and title to the Envestnet Advisor Q Functionality and that

Defendants never owned any interest in the Envestnet Advisor Q Functionality.  In the

alternative, assuming *arguendo* that Defendants may have owned some interest in the Envestnet

Advisor Q Functionality at some time, they relinquished that interest in agreements reached in

April and May 2009 (herein collectively called the "Second Amendment").

70.     Envestnet reasonably relied on Fetter's representations and agreements, included

in all written versions of the Second Amendment, that Envestnet was the sole owner of the

Envestnet Advisor Q Functionality.  Envestnet thereafter, at its own expense, developed the

Envestnet Advisor Q Functionality.  Envestnet would not have acted as it did if Defendants had

not relinquished any and all interest in the ownership of Envestnet Advisor Q Functionality.

71.     WHEREFORE, Envestnet prays for a declaration under 28 U.S.C. § 2201 that

Defendants are barred and/or estopped from asserting any rights in the Envestnet Advisor Q

Functionality by virtue of Fetter having agreed to terminate any interest it had in favor of Envestnet, that Envestnet owns all right, title and interest in all aspects of the Envestnet Advisor Q Functionality and that Envestnet retains the unrestricted right to market, sell, and use the Envestnet Advisor Q Functionality.

**COUNT III**
**PRELIMINARY AND PERMANENT INJUNCTION**

72.     Envestnet alleges and incorporates by reference all allegations in this Complaint, as though fully set forth herein.

73.     Based on Fetter's continued failure to sign the Second Amendment to the Operating Agreement and recent statements and actions of Fetter, David Fetter and other Fetter Logic representatives, Envestnet believes that Fetter is trying to cloud the title of Envestnet to ownership of the Envestnet Advisor Q Functionality and its right to market and sell that Functionality without any restrictions.

74.     Any action taken by Defendants to cloud the ownership interest of Envestnet in Envestnet Advisor Q Functionality could diminish Envestnet's ability to provide certain integrated services to its customers, customer relationships and goodwill.  The market for fully-integrated, web-based broker/dealer products is competitive and the technology evolves at a rapid pace.  Thus, it is imperative that Envestnet bring the Envestnet Advisor Q Functionality to market quickly so that it does not lose its competitive edge and share of the market.  Defendants' interference with Envestnet's ability to market and sell the Envestnet Advisor Q Functionality would thus cause irreparable injury to Envestnet for which there is no adequate remedy at law. Consequently, Defendants must be enjoined from interfering with Envestnet's rights to market and sell the Envestnet Advisor Q Functionality without restriction.

WHEREFORE, Envestnet prays for preliminary and permanent injunctive relief to enjoin the Defendants from interfering with Envestnet's ability to market and sell the Envestnet Advisor Q Functionality free from any restrictions.

**COUNT IV**
**BREACH OF CONTRACT AGAINST THE DEFENDANTS**

75.     Envestnet alleges and incorporates by reference all allegations in this Complaint, as though fully set forth herein.

76.     Envestnet and the Defendants are parties to the Investment Agreement entered into on December 19, 2008.  Envestnet has performed all its obligations under that Investment Agreement.

77.     As detailed above, the Defendants breached their obligations under the Investment Agreement in several material respects.  Those breaches include, but are not limited to, breaches of the express representations and warranties contained in the Investment Agreement, including breach of Section 2(h) concerning the disclosure of related-party transactions, breach of Section 2(k) concerning compliance with outstanding payment obligations, breach of Section 2(o) concerning the delivery of financial statements that fairly and adequately present the financial condition of Fetter at the time of closing, breach of Section 2(p) concerning disclosure of changes in the business since June 30, 2008 (including notice of changes in the financial condition of the company and notice of the loss of any major customers), and breach of Section 5(g) concerning the use of proceeds received from Envestnet.

78.     As a result of the Defendants' multiple breaches of the Investment Agreement, Envestnet has suffered substantial damages and the Defendants have been unjustly enriched, in amounts to be proven at trial.

79.     Envestnet and Fetter are parties to the Operating Agreement entered into on December 19, 2008.  Envestnet has performed all its obligations under the Investment Agreement.

80.     Fetter breached the Operating Agreement by, among other things, removing Jeff
Knight from the Steering Committee.

WHEREFORE, Envestnet prays for compensatory damages in an amount to be
determined at trial, including the lost value of Envestnet's investment in Fetter, and losses
resulting from Envestnet's decision to enter into the Investment and Operating Agreements with
Fetter.

**COUNT V**
**FRAUDULENT MISREPRESENTATIONS AND OMISSIONS**

81.     Envestnet alleges and incorporates by reference all allegations in this Complaint,
as though fully set forth herein.

82.     As detailed above, the Defendants made material misrepresentations and omitted
material facts in order to induce Envestnet to invest $5.7 million in the company and to "jointly"
develop software applications for Fetter's broker/dealer clients that Fetter did not have the
resources or technology to develop itself.

83.     These materially false statements include, but are not limited to, the Defendants'
certification that the "representations and warranties of the Company contained in Section 2 [of
the Investment Agreement] and the representations and warranties of the Shareholders contained
in Section 3 [of the Investment Agreement] are true and correct in all material respects on and as
of the Closing Date with the same effect as though such representations and warranties had been
made on and as of the date of the Closing Date," as well as the representations made by David
Fetter to Mr. Bergman regarding Fetter's current and expected revenue and operating loss, and
the representations made by Fetter CFO Ryan Tomazin's representation to Envestnet CFO Peter
D'Arrigo that "working capital was in line" with Fetter's previous projections, when in fact, all

representations were knowingly false.  Fetter also misrepresented the state of its software applications as detailed above.

84.     The Defendants withheld material information from Envestnet relating to Fetter's poor financial condition, such as the Fourth Quarter 2008 revenue and operating loss information known to the Defendants as of the Closing Date, the loan given to the company by Fetter Director Mike Urness just days before the Closing Date, and the overdue debts and accounts receivable that Fetter had permitted to accumulate as of the Closing Date.  Fetter had a duty to disclose these facts to Envestnet and these fraudulent omissions were designed to induce Envestnet to enter into the Investment and Operating Agreements.  As described above, Fetter also failed to disclose material facts about its software, including that the software was not able to be used by customers generally and could not be linked to major custodial databases.

85.     Each of these statements of fact were made, and omissions not made, by the Defendants knowing that those representations and omissions were false and misleading.  At a minimum, these statements and omissions were made recklessly by the Defendants.

86.     Defendants expected and intended Envestnet to rely on these false and misleading statements and omissions.  Indeed, the Investment Agreement specifically contemplates that Envestnet would rely upon the representations made by the Defendants that Fetter's financial condition had not materially changed since June 30, 2008, when, in fact, it had changed significantly.

87.     Section 6(a) of the Investment Agreement further provides that Envestnet's obligations at closing of the agreement are expressly conditioned on the representations and warranties of Fetter and the participating Shareholders, including David Fetter, being true in all material respects on the Closing Date.

88.     As a result of the Defendants' misrepresentations, Envestnet invested $4.9 million in Fetter and an additional $800,000 to purchase securities from its individual shareholders, including, primarily, David Fetter himself.  Envestnet also spent significant sums developing software.  Had Envestnet known the truth of Fetter's financial situation at the time the investment was made, Envestnet would not have made any investment (let alone at the share price paid), nor would it have entered into any other business arrangement with Fetter.  Furthermore, the share price Envestnet paid for Fetter stock was inflated well above its true value as a result of Defendant's misrepresentations.

89.     Envestnet has suffered a significant loss from its investment in Fetter as a result of Defendants' false and misleading representations.

WHEREFORE, Envestnet prays for compensatory damages in an amount to be determined at trial, including the lost value of Envestnet's investment in Fetter, punitive damages and losses resulting from Envestnet's decision to enter into the Investment and Operating Agreements with Fetter, the imposition of a constructive trust on the proceeds derived from Envestnet's investment in Fetter, and the appointment of a receiver to take custody of and manage the property of Fetter for the benefit of its creditors, including Envestnet.

DATED:  December 18, 2009                    ENVESTNET ASSET MANAGEMENT,
                                             INC.


                                   By:    /s/ Gary M. Miller_____
                                          One of Its Attorneys

Gary M. Elden
Todd C. Jacobs
Gary M. Miller
Grippo & Elden, LLC
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 704-7700
Facsimile:   (312) 558-1195

## CERTIFICATE OF SERVICE

I, Gary M. Miller, an attorney, hereby certify that on December 18, 2009,

I caused true and correct copies of the foregoing **ENVESTNET'S FIRST AMENDED**

**COMPLAINT** to be served by the Court's electronic filing notification system upon

counsel for the Defendants:

Anthony C. Valiulis                  Eric B. Liebman
Cassandra M. Crane                   **Moye White LLP**
**Much Selist Denenberg**            16 Market Square
**Ament & Rubenstein, P.C.**         1400 16th Street
191 North Wacker Drive               Denver, CO  80202
Suite 1800
Chicago, IL  60606-1615


                                     ___/s/ Gary M. Miller_____